```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


                                  )
ALLEN W. MILLIGAN,                )
                                  )
                                  )
     Plaintiff,                   )
                                  )    Civil Action No: 05-061
                                  )
     v.                           )    JUDGE LANCASTER
                                  )
JO ANNE B. BARNHART,              )    MAGISTRATE JUDGE CAIAZZA
Commissioner of Social            )
Security,                         )
                                  )
                                  )
     Defendant.                   )
```

**REPORT AND RECOMMENDATION**

**I. Recommendation**

Acting pursuant to 42 U.S.C. § 405(g), Allen Milligan ("Milligan" or "the claimant") appeals from a November 17, 2004 final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits. Cross-motions for summary judgment are pending. It is respectfully recommended that the claimant's motion (Doc. 10) be denied, and that the Commissioner's motion (Doc. 12) be granted.

**II. Procedural Background**

Milligan protectively applied for disability insurance benefits in September 1998, alleging that he became disabled in September 1994 when he injured his right knee in a construction accident. He complained of pain in his knee caused by surgery,

the build-up of calcium and scar tissue, and arthritis. (R. 119)[1] This first application was denied initially, and on reconsideration. At Milligan's request, a formal hearing was held on November 17, 1999 before an administrative law judge ("ALJ") in Pittsburgh, PA.

In a decision dated March 29, 2000, the ALJ denied Milligan's claim on the ground that he retained the residual functional capacity to perform "work of sedentary exertion with . . . added restrictions pertaining to his respiratory impairment . . . . " ( R. 52). These restrictions included an environment free of temperature extremes, smoke, humidity, and stairs." Id.

Milligan filed a request for review of the ALJ's decision, and, in an opinion dated March 1, 2002, the Appeals Council issued an order remanding Milligan's claim for a second hearing. (R. 79).

On February 19, 2003 a second hearing was held by the same ALJ. Milligan testified, as did a medical expert and a vocational expert. The ALJ again denied Milligan's claim on the ground that he possessed the residual functional capacity to perform a substantial range of sedentary work available in significant numbers in the national economy. (R.23). Milligan's request for review was denied on November 17, 2004, making the ALJ's decision the final decision of the Commissioner. This timely appeal followed.

---

[1] At the hearing, Milligan also alleged that he had a difficult time sleeping at night, slept during the day, and experienced shortness of breath, fatigue, and digestive discomfort. (R. 503).

### III. <u>Factual Background</u>

At the time of the second hearing, Milligan was a forty-six year old high school graduate who worked from the time that he graduated in 1975 until the fall of 1994 as a heavy laborer in general construction. (R. 145). The impairments underlying his claim for disability insurance can be traced to two mishaps. In the first, a 1982 near fatal car accident, Milligan suffered a broken jaw and broken ribs, in addition to lung, liver, and spleen injuries complicated by infection. The injury caused by the crash and his extended time on a ventilator scarred his lungs. Following a period of recovery, Milligan was able to return to work with no apparent problems[2] until September 1994 when unanchored cement block steps on which he was standing collapsed, trapping his foot and damaging his right knee. (R. 505)

Milligan underwent surgery to repair a torn meniscus in November 1994. (R.192) The course of his recovery was uneven. Two months after the surgery, he had made "very slow progress." (R. 344). By April 1995, his knee was "slowly improving." (R. 343). He continued to complain of pain, but was released to light duty in May. (R. 342). Despite extensive physical therapy, Milligan did not return to work, and continued to suffer pain in his right knee. He was referred to a work hardening program. The August

---

[2]Although the record does not show that it caused any limitation at the time, in 1988 Milligan was diagnosed with restrictive lung disease secondary to trauma caused by the car accident. His breathing improved when he stopped smoking and used an inhaler. (R. 379-80).

1995 progress note written by Dr. Hottenstein, his orthopedic surgeon and treating physician, stated, "Slowly but surely this man is improving, and at this point . . . I am hopeful that we can get this man back to his job." (R. 339). This did not happen.

In February 1996, Milligan continued to complain of knee pain. He underwent a functional capacity evaluation with his physical therapists, who concluded that he could return to light work. Dr. Hottenstein wrote in progress notes that he thought that Milligan could probably "do more as he could lift more, but just cannot squat." (R. 338). The doctor expressed doubt that Milligan would be able to go back to his old job, telling him that the choices were to have a second surgery, with no guarantees, or to learn another vocation. Id. Milligan opted to have a diagnostic arthroscopy in June 1996. (R. 336).

Two months following the second surgery, Dr. Hottenstein concluded that Milligan had reached the point of maximum medical improvement, making his return to construction unlikely. By the end of 1996, little had changed. Dr. Hottenstein believed that the residual capacity test proved that Milligan could carry 150 pounds. His lifting ability was excellent. "I think the only real limitation in this man is squatting. He could not pick that kind of weight up off the floor."(R. 334). "This man is real." Id. In April 1997, Dr. Hottenstein again expressed the belief that Milligan could work as long as he did not squat.

In July 1997, progress notes from his primary care physician, Dr. Baska, show that Milligan requested pain

medication for his knee. From that point, he regularly took darvocet or anti-inflammatories. He was also directed to take antacids to counter the impact of the pain medication on his digestive system.

Milligan saw Dr. Medich, the physician he had seen immediately following his knee injury, for a consultation in October 1998. Although Milligan stated that he still had pain in his knee, Dr. Medich did not make any significant findings. He recommended that Milligan continue taking Naprosyn and recommended additional physical therapy.

In the fall of 1998, Dr. Carpenter, a state agency physician, reviewed Milligan's medical records and conducted a functional capacity test. Her findings did not differ dramatically from those recorded in the earlier test. Milligan was capable of lifting up to fifty pounds occasionally, and twenty-five pounds frequently. He could stand, walk, or sit for six hours in a work day, and had unlimited ability to push and pull. Dr Carpenter concluded that Milligan was able to climb, balance, and stoop frequently, kneel occasionally, but could never crouch or crawl. (R.320). Dr. Le, another state agency physician, reviewed and confirmed Dr. Carpenter's findings. Id. At about this time, Milligan contacted Dr. Baska, complaining that he was nervous and couldn't sleep. He was given a prescription for lorazepam.

In February 1999, Milligan returned to Dr. Hottenstein for a recheck of his knee. He complained of increased pain and

tenderness along the lateral joint line. His knee did not show effusion or deformity, and had a good range of motion. Milligan was advised to increase his dosage of Motrin, but to be aware of possible gastric irritation, and to decrease the dose as the pain subsided.

In December 1999, Milligan saw Dr. Baska, complaining of gastrointestinal distress. Both Milligan and Dr. Baska believed that this discomfort was related to the medicines that Millgan was taking for pain. His drug regime was modified to include Prevacid and Celebrex. (R. 415). Milligan also complained of depression, but was not given medication until his January 2000 visit when Paxil was prescribed. An upper GI series revealed that he had a hiatal hernia and acid reflux. (R. 413).

In February 2000, Dr. Baska referred Milligan to a pulmonary specialist, Dr. Tapyrik, for assessment because he had complained over the prior year that he was experiencing gradually increasing shortness of breath. Dr. Tapyrik's report stated that Milligan's symptoms increased with exercise and exposure to certain irritants. He diagnosed a reactive airway disorder caused by scarring of the lungs following the 1982 car accident. Pulmonary function studies showed a "moderately severe restrictive defect." (R. 419). By April 2000, Milligan was no longer suffering from gastrointestinal problems, and reported being less depressed. (R. 413). He continued to have shortness of breath.

In June 2000, Milligan was admitted to the hospital with a suspected small bowel obstruction. The condition responded to

intravenous fluids.(R. 389). Following discharge, Dr. Baska referred Milligan to a gastroenterology specialist where he underwent an upper endoscopy and colonoscopy. These tests revealed Barrett's esophagus, for which he was directed to continue taking Prevacid.(R. 442).

In September 2000, Dr. Tapyrik wrote, "As a result of the permanent injuries to his lungs resulting from his [car] accident, it is difficult for him to maintain a full time job, especially if any exertion at all is required." (R. 418). A follow-up visit with Dr. Baska in November 2000 established that Milligan was "doing fairly well." (R.470). The record does not show that Milligan required or had a medical visit again until early 2002, when he had elective surgery to repair an incisional hernia, related small bowel adhesions, and an obstruction. (R. 445).

Dr. Tapyrik conducted pulmonary function studies in July 2002, noting "a moderate restrictive defect that has worsened since 1999." (R.432). He attributed part of the decreased capacity to Milligan's weight gain and stated that his decreased expiratory flow could be caused by a beta-blocker that Milligan was taking to control hypertension. He expressed the opinion that Milligan's shortness of breath had increased following surgery and could be due to scarring from old injuries. He then wrote:

> Despite the change in his pulmonary function, the abnormalities are not severe enough that they are likely to result in a determination of total disability on that basis alone. Possibly his dyspnea in addition to his leg injury and GI problems would result in a determination of disability.

Id.

Approximately two months later, Dr. Tapyrik evaluated Milligan's ability to do physical work-related activities. Dr Tapyrik said that he could lift and carry up to ten pounds, and could sit for eight hours in a work day, but no more than two hours at one time. (R. 427). He could stand and could walk three hours per day, but only one hour at a time. He could climb occasionally, but could never balance stoop, crouch, kneel, or crawl. (R. 428).

In October 2002, at the request of the Pennsylvania Bureau of Disability Determination, Milligan was evaluated by psychologist, Dr. Landefeld. In his report, Dr. Landefeld described Milligan as "goal directed and relevant" with spontaneous thought and good concept formation. (R. 37). Although his ability to recall childhood events was poor, his recent past memory and recent memory were good. He could repeat five numbers forward and three backward. Id. His social adjustment appeared to be good. Milligan told Dr. Landefeld that he sometimes sat on a neighbor's porch or played with his grandchildren. (R. 438).

On a less positive note, Landefeld stated that Milligan lacked test judgment, and reported being irritable and depressed with suicidal thoughts "a few years ago." (R. 437). He had problems with concentration, could not perform serial sevens, and had impulse control problems. Dr. Landefeld also concluded that Milligan had poor or no ability to follow work rules, deal with the public, use judgment, or cope with work stresses. His ability

-8-

to relate to co-workers, interact with supervisors, function independently, and maintain concentration was only fair. Asked to cite the medical/clinical findings supporting his findings, Dr. Landefeld wrote, "poor judgment -irritable - angry." (R. 440).

When he ranked Milligan's ability to make performance judgements, Dr. Landefeld stated that he had no or poor ability to remember or carry out complex job instructions or to carry out detailed but not complex instructions. He had only fair ability to understand, remember and carry out simple job instructions. The medical/clinical findings supporting these conclusions, were identified as, "Problems with concentration." (R. 440).

Despite his positive evaluation of Milligan's social adjustment earlier in the report, Dr. Landefeld wrote that Milligan had fair ability to maintain his personal appearance, but had little or no ability to behave in an emotionally stable manner, relate predictably in social situations, or to be reliable. In response to the question asking him to describe the medical/clinical findings for these observations, Landefeld gave a several word illegible response. (R. 441.).

Although Milligan's results on the Minnesota Multi-Phasic Personality Inventory showed depression, Landefeld stated that the test was invalid. He attributed this to possible misreading, or said that "it could also be seen as [Milligan] exaggerating his symptomology." (R. 438). Landefeld did not, however, believe that Milligan had overstated his symptoms.

In January 2003, Dr. Tapyrik re-evaluated Milligan's

physical capacity. His conclusions were substantially similar to those he reached in September 2002.

Milligan continues to maintain that he is unable to perform any type of work.

## IV. The Standard of Review

The Social Security Act ("the Act") limits judicial review of the Commissioner's final decision regarding benefits to a determination of whether the factual findings are supported by substantial evidence, Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir 1984). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Stunkard v. Secretary of Health and Human Services, 841 F. 2d 57, 59 (3d Cir. 1988)(quoting Richardson v. Perales, 402 U.S. 389, 401(1971)). It consists of "more than a scintilla of evidence, but less than a preponderance." Id.

## V. DISCUSSION

### A. Subjective Testimony and the Medical Evidence

In this appeal, Milligan raises three allegations of error: (1) the ALJ failed to give proper consideration to the medical evidence; (2) the ALJ failed to credit fully Milligan's subjective complaints; and (3) the denial of benefits was based on the vocational expert's response to a hypothetical question that failed to include all of Milligan's impairments.

Milligan's first and second allegations of error are

inextricably tied. Essentially, he argues that the medical evidence does not support the ALJ's failure to accept each of the subjective complaints and limitations described by Milligan. The court does not agree. In fact, the ALJ went out of his way to adopt a broad range of limitations on Milligan's ability to work, incorporating virtually every restriction supported by the evidence.

None of the physicians of record offered the opinion that Milligan was totally disabled. The only suggestion that Milligan could not perform restricted sedentary work came from Milligan's subjective testimony, and the report prepared by Dr. Landefeld. The ALJ did not, as Milligan argues, ignore these items of evidence. Instead, he explained why he was unwilling to give full credence to either.

The ALJ concluded first that Milligan's complaints were out of proportion to the medical evidence. At the time of the first hearing, Milligan testified that he was able to drive his wife to and from work, walk regularly for ten minutes two times per day, shop once per week, and attend car cruises with his wife in her vintage car, where he could walk for about ten minutes to see at least some of the other cars. Furthermore, he was able to perform light maintenance work for six months during the years during which he claims to have been disabled. (R. 119-20).[3] At the

---

[3]Even were the court to exclude this work on the theory that Milligan was required to report whether he could actually work or not in order to receive workers compensation, its analysis would not change. The other evidence is sufficient to sustain the result.

second hearing, Milligan testified that he drove occasionally, was able to take public transportation, go to the grocery store, and pick up fast food. (R. 537-38).

Evidence bearing on Milligan's claim that he suffered from severe depression is sparse and contradictory. The court is not able to locate and Milligan does not make any reference in the record to depression prior to 2000. The evidence shows that Milligan began taking antidepressant medication between January and April 2000, after the first administrative hearing. In April 2000, Dr. Baska's progress notes include the observation that Paxil "definitely" seemed to help his depression. (R. 413). Milligan never sought the services of a mental health professional, and has never been hospitalized for psychiatric or psychological reasons. He did not allege depression in his original claim for disability benefits, or make reference to depression in his testimony at the first administrative hearing. He did testify at the most recent proceeding that he had suffered from depression since 1996.

The only other evidence suggestive of severe depression is the report prepared by Dr. Landefeld. It is an understatement to say that Dr. Landefeld's findings do not align with other evidence in the record. When he was asked to provide the clinical/medical evidence for his rather extreme conclusions, Dr. Landefeld simply repeated a few words from his own findings. This may have been because there <u>is</u> no supporting clinical or medical evidence.

Milligan himself reported that he was able to get along with other people, didn't have trouble going out in public, had never had a problem with authority, did not have trouble following or carrying out directions, got along with his supervisors, tried to settle disagreements, could adapt well to change, and had never been in fights, evicted or fired. (R. 142-43). His supervisors in the jobs that he performed in return for workers compensation payments gave him positive reviews. His doctors described him as pleasant. In light of the entire record, the court is not surprised that the ALJ gave minimal weight to Dr. Landefeld's report.

Despite the fact that the ALJ did not place a great deal of confidence in the report, he nonetheless imposed limitations on Milligan's ability to work that took many of Dr. Landefeld's conclusions into account. The ALJ specified that Milligan could perform only routine repetitive work with several step instructions, and could tolerate only occasional contact with the public, supervisors, or co-workers. He also concluded that Milligan required a low stress work environment where he would not be called upon to make decisions. (R.23).

The court does not find error in the ALJ's consideration of the subjective or the medical evidence. It finds instead that he considered the evidence from all sources, analyzed it in a thorough and reasonable manner, and used it to craft a conservative formulation of Milligan's residual functional capacity.

## B. **Did the ALJ Err in Disregarding the Third Hypothetical?**

In light of the court's resolution of the other issues raised in this appeal, the court need not devote extended discussion to the contention that the ALJ erred in failing to base his decision on the final hypothetical question posed to the vocational expert. Milligan argues that only in that hypothetical did the ALJ "incorporate[] the limitations that Plaintiff testified to and which are documented in the record." (Clmt. Br. 9). The transcript of the second hearing contains the following exchange:

> ALJ: And now for the third hypothetical. Again, all of the limitations so far continue to apply. Here, however, walking is reduced to one block per occurrence. In addition to the environmental limitations given so far[,] the individual should avoid being in the presence of perfumes along with the chemical irritants already given. This individual experiences a sleep disturbance,[e]ssentially sleeping two hours and up two hours running in 24-hour cycles and as a result would not be able to maintain regular attendance at a job. How would this affect the vocational picture?
>
> VE:  That person would not be able to work, Your Honor.

In determining Milligan's entitlement to benefits, the ALJ disregarded this question, finding that his testimony regarding his need to sleep or lie down during the day was not supported by the record. An ALJ is not required to credit a hypothetical question where the question is based on limitations not substantiated by the evidence. Burns v. Barnhart, 312 F.3d 113,

-14-

123 (3d Cir. 2002).

The only evidence relevant to Milligan's need to lie down or sleep during the day came from Milligan himself.[4] The court has already reviewed the ALJ's finding that Milligan's testimony was only partially credible. For similar reasons, it finds that the ALJ was not required to credit fully Milligan's contention that napping was essential. None of the medical evidence documents this need. Dr. Nackley, the impartial medical expert called to testify at the second hearing, stated that the medical record did not explain the irregularities in Milligan's sleep patterns.(R. 554). Although he testified that some of Milligan's impairments could contribute to fatigue and waking, he did not state that these impairments caused Milligan a need for sleep during the day. Such testimony would have contradicted his opinion that Milligan was capable of standing for four hours in a day, and could sit indefinitely. (R. 550). Milligan's attorney did not question Dr. Nackley with respect to Milligan's need to lie down during the day, and did not refer to any other alleged impairment when he was invited to examine the expert.

In these circumstances, the court concludes that the ALJ did not err in declining to base his decision on the question posed

---

[4] Although he has not raised this issue directly, in the interest of completeness, the court notes that the same is true with Milligan's bowel problems. Milligan's only reference to this condition is his statement that, "Stomach problems would probably keep me out of work the majority of the time." (R. 547). There is no medical evidence that this bowel condition precludes Milligan from working, or would mandate limitations not already taken into account in assessing his residual functional capacity.

in the third hypothetical.

### **VI**. **Conclusion**

Because the allegations of error raised by the claimant lack merit, the Motion for Summary Judgment filed by the Commissioner (Doc. 12) should be granted, and the Motion for Summary Judgment filed by the claimant (Doc. 14) should be denied.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b)(1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by March 23, 2006. Responses to objections are due by April 3, 2006.

March 7, 2006

/S/ Francis X. Caiazza
Francis X. Caiazza
U.S. Magistrate Judge

cc:

Amiel B. Caramanna, Jr., Esq.
3400 Grant Building
310 Grant Street
Pittsburgh, PA 15219

Paul Skirtich
Asst. U.S. Attorney
Western District of PA
700 Grant Street, Suite 4000
Pittsburgh, PA 15219